# SUMMONS
## (CITACION JUDICIAL)

**SUM-100**

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**ENDORSED FILED**
ALAMEDA COUNTY

DEC 1 7 2009

CLERK OF THE SUPERIOR COURT
By ERICA BAKER

**NOTICE TO DEFENDANT:** A. W. CHESTERTON COMPANY;
*(AVISO AL DEMANDADO):* [SEE ATTACHMENT FOR ADDITIONAL DEFENDANTS]

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
WILLIAM HIGGINS AND ANTOINETTE HIGGINS

CA 6478

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA<br>1225 FALLON STREET<br><br>OAKLAND, CA 94612 | CASE NUMBER:<br>*(Número del Caso):*<br>**09489762** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
JEFFREY A. KAISER, ESQ. [SBN 160594]          (415) 646-7160   (415) 981-1270
LEVIN SIMES KAISER & GORNICK, LLP
44 MONTGOMERY STREET, 36TH FLOOR
SAN FRANCISCO, CALIFORNIA 94104

DATE: **DEC 1 7 2009**        Clerk, by PAT S. SWEETEN        Executive Officer/Clerk of the Superior Court ERICA BAKER , Deputy
*(Fecha)*                    *(Secretario)*                                              *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*
3. [X] on behalf of *(specify):* LESLIE CONTROLS, INC.

    under: [X] CCP 416.10 (corporation)         [ ] CCP 416.60 (minor)
           [ ] CCP 416.20 (defunct corporation)  [ ] CCP 416.70 (conservatee)
           [ ] CCP 416.40 (association or partnership)  [ ] CCP 416.90 (authorized person)
           [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

[SEAL]

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Legal Solutions Plus

Code of Civil Procedure §§ 412.20, 465

1    Attachment to Summons

2

3    **WILLIAM HIGGINS AND ANTOINETTE HIGGINS,**    )    No.

             )

4                    **PLAINTIFFS,**    )

             )

5                      **VS.**    )

             )

6    **A. W. CHESTERTON COMPANY;**    )

   **ALLIED PACKING & SUPPLY, INC.;**    )

7    **ASBESTOS CORPORATION, LTD.;**    )

   **AURORA PUMPS;**    )

8    **BORG-WARNER CORPORATION BY ITS**    )

   **SUCCESSOR-IN-INTEREST, BORG-WARNER MORSE**    )

9    **TEC INC.;**    )

   **BUFFALO PUMPS, INC.;**    )

10    **CATERPILLAR, INC.;**    )

   **CRANE CO., INDIVIDUALLY AND AS SUCCESSOR-**    )

11    **IN-INTEREST TO CHAPMAN VALVE CO.;**    )

   **CROWN, CORK & SEAL, INDIVIDUALLY AND AS**    )

12    **SUCCESSOR-IN-INTEREST TO MUNDET CORK;**    )

   **DAIMLER TRUCKS NORTH AMERICA LLC,**    )

13    **INDIVIDUALLY AND ON BEHALF OF ITS**    )

   **FREIGHTLINER TRUCKS DIVISION;**    )

14    **EUCLID-HITACHI HEAVY EQUIPMENT, LTD;**    )

   **FLOWSERVE CORPORATION,  INDIVIDUALLY AND**    )

15    **AS-SUCCESSOR-IN-INTEREST TO PACIFIC PUMP;**    )

   **GARDNER DENVER, INC.;**    )

16    **GARLOCK SEALING TECHNOLOGIES LLC,**    )

   **INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST**    )

17    **TO GARLOCK, INC.;**    )

   **GENERAL ELECTRIC COMPANY;**    )

18    **GOULDS PUMPS, INCORPORATED;**    )

   **HITACHI CONSTRUCTION TRUCK**    )

19    **MANUFACTURING LTD., FKA EUCLID-HITACHI**    )

   **HEAVY EQUIPMENT, LTD;**    )

20    **HONEYWELL INTERNATIONAL, INC.  FKA ALLIED**    )

   **SIGNAL INC., INDIVIDUALLY AND AS SUCCESSOR-**    )

21    **IN-INTEREST TO THE BENDIX CORPORATION;**    )

   **IMO INDUSTRIES, INC. FORMERLY KNOWN AS**    )

22    **IMO DELAVAL INC.;**    )

   **INGERSOLL-RAND COMPANY;**    )

23    **KAMAN INDUSTRIAL TECHNOLOGIES**    )

   **CORPORATION, INDIVIDUALLY AND AS**    )

24    **SUCCESSOR-IN-INTEREST TO WINN SUPPLY**    )

   **COMPANY;**    )

25    **KENWORTH SALES COMPANY;**    )

   **LESLIE CONTROLS, INC.;**    )

26

27

28

---

1

ATTACHMENT TO SUMMONS

1   M. SLAYEN AND ASSOCIATES, INC.;                                )
    METALCLAD INSULATION CORPORATION;                              )
2   PACCAR, INC. INDIVIDUALLY, AS SUCCESSOR-IN-                    )
    INTEREST, DBA AND FKA PETERBILT MOTORS                         )
3   COMPANY AND KENWORTH;                                          )
4   PAGE GROUP HOLDINGS, INC.;                                     )
    PARKER-HANNIFIN CORPORATION,                                   )
5   INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST                      )
    TO SACOMO SIERRA AND SACOMO                                    )
6   MANUFACTURING COMPANY;                                         )
7   PATTERSON PUMP COMPANY, INDIVIDUALLY, AS                       )
    PARENT ALTER EGO AND SUCCESSOR-IN-                             )
8   INTEREST TO C.H. WHEELER;                                      )
    PLANT PRODUCTS & SUPPLY CO.;                                   )
9   PNEUMO-ABEX LLC, INDIVIDUALLY AND AS                           )
    SUCCESSOR-IN-INTEREST TO ABEX                                  )
10  CORPORATION;                                                   )
11  SEPCO CORPORATION;                                             )
    SOCO-WEST, INC. FKA BRENNTAG WEST, INC. FKA                    )
12  SOCO-LYNCH CORPORATION, INDIVIDUALLY AND                       )
    AS SUCCESSOR-IN-INTEREST TO WESTERN                            )
13  CHEMICAL & MANUFACTURING COMPANY;                              )
14  TEREX CORPORATION;                                             )
    UNION CARBIDE CORPORATION;                                     )
15  VIACOM, INCORPORATED AS SUCCESSOR-BY-                          )
    MERGER TO CBS CORPORATION FKA                                  )
16  WESTINGHOUSE ELECTRIC CORPORATION;                             )
17  WEIL PUMP COMPANY;                                             )
    WEIL PUMP COMPANY INC.;                                        )
18  WESTERN STATES EQUIPMENT COMPANY,                              )
    INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST                      )
19  TO WESTERN EQUIPMENT COMPANY;                                  )
    YARWAY CORPORATION AND THE FIRST DOE                           )
20  THROUGH THREE HUNDREDTH DOE, INCLUSIVE,                        )
21                    DEFENDANTS.                                  )
                                                                   )
22  _____                  )

23

24

25

26

27

28

ATTACHMENT TO SUMMONS

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| T. SCOTT HAMES, ESQ. [SBN 197574]<br>LEVIN SIMES KAISER & GORNICK, LLP<br>44 MONTGOMERY STREET, 36TH FLOOR<br><br>SAN FRANCISCO, CALIFORNIA  94104<br>TELEPHONE NO.: (415) 646-7160   FAX NO.: (415) 981-1270<br>ATTORNEY FOR *(Name):*  WILLIAM HIGGINS AND ANTOINETTE HIGGINS | **ENDORSED**<br>**FILED**<br>ALAMEDA COUNTY<br><br>DEC 1 7 2009<br><br>CLERK OF THE SUPERIOR COURT<br>ERICA BAKER |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
STREET ADDRESS: 1225 FALLON STREET
MAILING ADDRESS:
CITY AND ZIP CODE: OAKLAND, CA 94612
BRANCH NAME:

CASE NAME:    WILLIAM HIGGINS, et al. vs. A. W.
CHESTERTON COMPANY, et al.

| CIVIL CASE COVER SHEET<br>[X] Unlimited      [ ] Limited<br>(Amount              (Amount<br>demanded          demanded is<br>exceeds $25,000)  $25,000 or less) | Complex Case Designation<br>[ ] Counter    [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CASE NUMBER: RG09489708<br>JUDGE:<br>DEPT: |
|---|---|---|

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| **Auto Tort** | **Contract** | **Provisionally Complex Civil Litigation** |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | **(Cal. Rules of Court, rules 3.400-3.403)** |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Antitrust/Trade regulation (03) |
| **Other PI/PD/WD (Personal Injury/Property** | [ ] Other collections (09) | [ ] Construction defect (10) |
| **Damage/Wrongful Death) Tort** | [ ] Insurance coverage (18) | [ ] Mass tort (40) |
| [X] Asbestos (04) | [ ] Other contract (37) | [ ] Securities litigation (28) |
| [ ] Product liability (24) | **Real Property** | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | [ ] Eminent domain/Inverse | [ ] Insurance coverage claims arising from the |
| [ ] Other PI/PD/WD (23) | condemnation (14) | above listed provisionally complex case |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | types (41) |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | **Enforcement of Judgment** |
| [ ] Civil rights (08) | **Unlawful Detainer** | [ ] Enforcement of judgment (20) |
| [ ] Defamation (13) | [ ] Commercial (31) | **Miscellaneous Civil Complaint** |
| [ ] Fraud (16) | [ ] Residential (32) | [ ] RICO (27) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | [ ] Other complaint *(not specified above)* (42) |
| [ ] Professional negligence (25) | **Judicial Review** | **Miscellaneous Civil Petition** |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Partnership and corporate governance (21) |
| **Employment** | [ ] Petition re: arbitration award (11) | [ ] Other petition *(not specified above)* (43) |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [ ] is  [X] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the
   factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties      d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel  e. [ ] Coordination with related actions pending in one or more courts
      issues that will be time-consuming to resolve                  in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence          f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [X] monetary b. [ ] nonmonetary; declaratory or injunctive relief  c. [X] punitive

4. Number of causes of action *(specify):*  3

5. This case [ ] is  [X] is not   a class action suit.

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: December 16, 2009

T. SCOTT HAMES, ESQ. [SBN 197574]
_____
(TYPE OR PRINT NAME)                                               (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed
  under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result
  in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all**
  other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

CIVIL CASE COVER SHEET

Legal
Solutions
& Plus

Cal. Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

| Short Title: WILLIAM HIGGINS, et al. vs. A. W. CHESTERTON COMPANY, et al. | Case Number: |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM

**THIS FORM IS REQUIRED IN ALL NEW <u>UNLIMITED</u> CIVIL CASE FILINGS IN THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**

| | | Hayward Hall of Justice (447) |
|---|---|---|
| [ X ] Oakland, Rene C. Davidson Alameda County Courthouse (446) | | [ ] Pleasanton, Gale-Schenone Hall of Justice (448) |

| Civil Case Cover Sheet Category | Civil Case Cover Sheet Case Type | Alameda County Case Type (check only one) |
|---|---|---|
| Auto Tort | Auto tort (22) | [ ] 34 Auto tort (G)<br>Is this an uninsured motorist case ? [ ] yes [ ] no |
| Other PI /PD / WD Tort | Asbestos (04)<br>Product liability (24)<br>Medical malpractice (45)<br>Other PI/PD/WD tort (23) | [X] 75 Asbestos (D)<br>[ ] 89 Product liability (not asbestos or toxic tort/environmental) (G)<br>[ ] 97 Medical malpractice (G)<br>[ ] 33 Other PI/PD/WD tort (G) |
| Non - PI /PD / WD Tort | Bus tort / unfair bus. practice (07)<br>Civil rights (08)<br>Defamation (13)<br>Fraud (16)<br>Intellectual property (19)<br>Professional negligence (25)<br>Other non-PI/PD/WD tort (35) | [ ] 79 Bus tort / unfair bus. practice (G)<br>[ ] 80 Civil rights (G)<br>[ ] 84 Defamation (G)<br>[ ] 24 Fraud (G)<br>[ ] 87 Intellectual property (G)<br>[ ] 59 Professional negligence - non-medical (G)<br>[ ] 03 Other non-PI/PD/WD tort (G) |
| Employment | Wrongful termination (36)<br>Other employment (15) | [ ] 38 Wrongful termination (G)<br>[ ] 85 Other employment (G)<br>[ ] 53 Labor comm award confirmation<br>[ ] 54 Notice of appeal - L.C.A. |
| Contract | Breach contract / Wrnty (06)<br>Collections (09)<br>Insurance coverage (18)<br>Other contract (37) | [ ] 04 Breach contract / Wrnty (G)<br>[ ] 81 Collections (G)<br>[ ] 86 Ins. coverage - non-complex (G)<br>[ ] 98 Other contract (G) |
| Real Property | Eminent domain / Inv Cdm (14)<br>Wrongful eviction (33)<br>Other real property (26) | [ ] 18 Eminent domain / Inv Cdm (G)<br>[ ] 17 Wrongful eviction (G)<br>[ ] 36 Other real property (G) |
| Unlawful Detainer | Commercial (31)<br>Residential (32)<br>Drugs (38) | [ ] 94 Unlawful Detainer - commercial    Is the deft. in possession<br>[ ] 47 Unlawful Detainer - residential    of the property?<br>[ ] 21 Unlawful detainer - drugs    [ ] Yes [ ] No |
| Judicial Review | Asset forfeiture (05)<br>Petition re: arbitration award (11)<br>Writ of Mandate (02)<br><br>Other judicial review (39) | [ ] 41 Asset forfeiture<br>[ ] 62 Pet. re: arbitration award<br>[ ] 49 Writ of mandate<br>Is this a CEQA action (Publ.Res.Code section 21000 et seq) [ ] Yes [ ] N<br>[ ] 64 Other judicial review |
| Provisionally Complex | Antitrust / Trade regulation (03)<br>Construction defect (10)<br>Claims involving mass tort (40)<br>Securities litigation (28)<br>Toxic tort / Environmental (30)<br>Ins covrg from cmplx case type (41) | [ ] 77 Antitrust / Trade regulation<br>[ ] 82 Construction defect<br>[ ] 78 Claims involving mass tort<br>[ ] 91 Securities litigation<br>[ ] 93 Toxic tort / Environmental<br>[ ] 95 Ins covrg from complex case type |
| Enforcement of Judgment | Enforcement of judgment (20) | [ ] 19 Enforcement of judgment<br>[ ] 08 Confession of judgment |
| Misc. Complaint | RICO (27)<br>Partnership / Corp. governance (21)<br>Other complaint (42) | [ ] 90 RICO (G)<br>[ ] 88 Partnership / Corp. governance (G)<br>[ ] 68 All other complaints (G) |
| Misc. Civil Petition | Other petition (43) | [ ] 06 Change of name<br>[ ] 69 Other petition |

AL2C

1  JEFFREY A. KAISER, ESQ. [SBN 160594]
   T. SCOTT HAMES, ESQ. [SBN 197574]
2  **LEVIN SIMES KAISER & GORNICK, LLP**
   44 Montgomery Street, 36th Floor
3  San Francisco, California 94104
   Telephone    (415) 646-7160
4  Facsimile    (415) 981-1270

5  Attorneys for Plaintiffs
   WILLIAM HIGGINS AND ANTOINETTE HIGGINS

**ENDORSED
FILED**
ALAMEDA COUNTY

DEC 1 7 2009

CLERK OF THE SUPERIOR COURT
By: ERICA BAKER

6

7

8              SUPERIOR COURT OF CALIFORNIA
                   COUNTY OF ALAMEDA
9
              (UNLIMITED JURISDICTION)
10

11  **WILLIAM HIGGINS AND ANTOINETTE HIGGINS,**          No. **RG 09489782**

12              **PLAINTIFFS,**

13                  **VS.**                              **COMPLAINT FOR
                                                           DAMAGES**
14  **A. W. CHESTERTON COMPANY;**
    **ALLIED PACKING & SUPPLY, INC.;**                   NEGLIGENCE,
15  **ASBESTOS CORPORATION, LTD.;**                      STRICT LIABILITY,
                                                          PUNITIVE DAMAGES,
16  **AURORA PUMPS;**                                    LOSS OF CONSORTIUM,
    **BORG-WARNER CORPORATION BY ITS**
17  **SUCCESSOR-IN-INTEREST, BORG-WARNER MORSE**         (ASBESTOS)
    **TEC INC.;**
18  **BUFFALO PUMPS, INC.;**
    **CATERPILLAR, INC.;**
19  **CRANE CO., INDIVIDUALLY AND AS SUCCESSOR-**
20  **IN-INTEREST TO CHAPMAN VALVE CO.;**
    **CROWN, CORK & SEAL, INDIVIDUALLY AND AS**
21  **SUCCESSOR-IN-INTEREST TO MUNDET CORK;**
    **DAIMLER TRUCKS NORTH AMERICA LLC,**
22  **INDIVIDUALLY AND ON BEHALF OF ITS**
    **FREIGHTLINER TRUCKS DIVISION;**
23  **EUCLID-HITACHI HEAVY EQUIPMENT, LTD;**
24  **FLOWSERVE CORPORATION, INDIVIDUALLY AND**
    **AS-SUCCESSOR-IN-INTEREST TO PACIFIC PUMP;**
25  **GARDNER DENVER, INC.;**
    **GARLOCK SEALING TECHNOLOGIES LLC,**
26  **INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST**
27  **TO GARLOCK, INC.;**
    **GENERAL ELECTRIC COMPANY;**
28  **GOULDS PUMPS, INCORPORATED;**

1

COMPLAINT FOR DAMAGES

| | |
|---|---|
| 1 | HITACHI CONSTRUCTION TRUCK ) |
| | MANUFACTURING LTD., FKA EUCLID-HITACHI ) |
| 2 | HEAVY EQUIPMENT, LTD; ) |
| | HONEYWELL INTERNATIONAL, INC. FKA ALLIED ) |
| 3 | SIGNAL INC., INDIVIDUALLY AND AS SUCCESSOR- ) |
| 4 | IN-INTEREST TO THE BENDIX CORPORATION; ) |
| | IMO INDUSTRIES, INC. FORMERLY KNOWN AS ) |
| 5 | IMO DELAVAL INC.; ) |
| 6 | INGERSOLL-RAND COMPANY; ) |
| | KAMAN INDUSTRIAL TECHNOLOGIES ) |
| 7 | CORPORATION, INDIVIDUALLY AND AS ) |
| | SUCCESSOR-IN-INTEREST TO WINN SUPPLY ) |
| 8 | COMPANY; ) |
| | KENWORTH SALES COMPANY; ) |
| 9 | LESLIE CONTROLS, INC.; ) |
| 10 | M. SLAYEN AND ASSOCIATES, INC.; ) |
| | METALCLAD INSULATION CORPORATION; ) |
| 11 | PACCAR, INC. INDIVIDUALLY, AS SUCCESSOR-IN- ) |
| | INTEREST, DBA AND FKA PETERBILT MOTORS ) |
| 12 | COMPANY AND KENWORTH; ) |
| 13 | PAGE GROUP HOLDINGS, INC.; ) |
| | PARKER-HANNIFIN CORPORATION, ) |
| 14 | INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST ) |
| | TO SACOMO SIERRA AND SACOMO ) |
| 15 | MANUFACTURING COMPANY; ) |
| | PATTERSON PUMP COMPANY, INDIVIDUALLY, AS ) |
| 16 | PARENT ALTER EGO AND SUCCESSOR-IN- ) |
| 17 | INTEREST TO C.H. WHEELER; ) |
| | PLANT PRODUCTS & SUPPLY CO.; ) |
| 18 | PNEUMO-ABEX LLC, INDIVIDUALLY AND AS ) |
| | SUCCESSOR-IN-INTEREST TO ABEX ) |
| 19 | CORPORATION; ) |
| 20 | SEPCO CORPORATION; ) |
| | SOCO-WEST, INC. FKA BRENNTAG WEST, INC. FKA ) |
| 21 | SOCO-LYNCH CORPORATION, INDIVIDUALLY AND ) |
| | AS SUCCESSOR-IN-INTEREST TO WESTERN ) |
| 22 | CHEMICAL & MANUFACTURING COMPANY; ) |
| | TEREX CORPORATION; ) |
| 23 | UNION CARBIDE CORPORATION; ) |
| 24 | VIACOM, INCORPORATED AS SUCCESSOR-BY- ) |
| | MERGER TO CBS CORPORATION FKA ) |
| 25 | WESTINGHOUSE ELECTRIC CORPORATION; ) |
| | WEIL PUMP COMPANY; ) |
| 26 | WEIL PUMP COMPANY INC.; ) |
| 27 | WESTERN STATES EQUIPMENT COMPANY, ) |
| | INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST ) |
| 28 | TO WESTERN EQUIPMENT COMPANY; ) |

2

COMPLAINT FOR DAMAGES

YARWAY CORPORATION                          )
AND THE FIRST DOE THROUGH THREE             )
HUNDREDTH DOE, INCLUSIVE,                    )
                                             )
            DEFENDANTS.                       )
                                             )

## GENERAL ALLEGATIONS

1.      The true names and capacities, whether individual, corporate, associate, governmental or otherwise, of defendants FIRST DOE through THREE HUNDREDTH DOE, inclusive, are unknown to Plaintiffs at this time, who therefore sue said defendants by such fictitious names.  When the true names and capacities of said defendants have been ascertained, Plaintiff will amend this complaint accordingly.  Plaintiffs are informed and believe, and thereon allege, that each defendant designated herein as a DOE is responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and caused injuries and damages proximately thereby to the Plaintiffs, as hereinafter alleged.

2.      At all times herein mentioned, each of the defendants, except as otherwise alleged, was the agent, servant, employee and/or joint venturer of the other defendants, and each of them, and at all said times, each defendant was acting in the full course and scope of said agency, service, employment and/or joint venture. Plaintiffs do not allege that Asbestos Corporation Ltd. was the agent, servant, employee and/or joint venturer of any entity during any of the years Asbestos Corporation Ltd. was owned by any governmental agency.  Certain defendants agreed and conspired among themselves, and with certain other individuals and/or entities, to act, or not to act, in such a manner that resulted in injury to the Plaintiff, WILLIAM HIGGINS; and such defendants, as co-conspirators, are liable for the acts, or failures to act, of other conspiring defendants.  Plaintiffs do not allege that Asbestos Corporation Ltd. conspired with any entity during any of the years Asbestos Corporation Ltd. was owned by any governmental agency.

3.      Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, defendants, A. W. CHESTERTON COMPANY; ALLIED PACKING & SUPPLY, INC.; ASBESTOS CORPORATION, LTD.;  AURORA PUMPS; BORG-WARNER

1  CORPORATION BY ITS SUCCESSOR-IN-INTEREST, BORG-WARNER MORSE TEC
2  INC.; BUFFALO PUMPS, INC.; CATERPILLAR, INC.; CRANE CO., INDIVIDUALLY
3  AND AS SUCCESSOR-IN-INTEREST TO CHAPMAN VALVE CO.; CROWN, CORK &
4  SEAL, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO MUNDET CORK;
5  DAIMLER TRUCKS NORTH AMERICA LLC,  INDIVIDUALLY AND ON BEHALF OF
6  ITS FREIGHTLINER TRUCKS DIVISION; EUCLID-HITACHI HEAVY EQUIPMENT,
7  LTD; FLOWSERVE CORPORATION,  INDIVIDUALLY AND AS-SUCCESSOR-IN-
8  INTEREST TO PACIFIC PUMP; GARDNER DENVER, INC.; GARLOCK SEALING
9  TECHNOLOGIES LLC, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO
10  GARLOCK, INC.; GENERAL ELECTRIC COMPANY; GOULDS PUMPS,
11  INCORPORATED; HITACHI CONSTRUCTION TRUCK MANUFACTURING LTD.,
12  FKA EUCLID-HITACHI HEAVY EQUIPMENT, LTD; HONEYWELL
13  INTERNATIONAL, INC. FKA ALLIED SIGNAL INC., INDIVIDUALLY AND AS
14  SUCCESSOR-IN-INTEREST TO THE BENDIX CORPORATION; IMO INDUSTRIES,
15  INC. FORMERLY KNOWN AS IMO DELAVAL INC.; INGERSOLL-RAND COMPANY;
16  KAMAN INDUSTRIAL TECHNOLOGIES CORPORATION, INDIVIDUALLY AND AS
17  SUCCESSOR-IN-INTEREST TO WINN SUPPLY COMPANY; KENWORTH SALES
18  COMPANY; LESLIE CONTROLS, INC.; M. SLAYEN AND ASSOCIATES, INC.;
19  METALCLAD INSULATION CORPORATION; PACCAR, INC. INDIVIDUALLY, AS
20  SUCCESSOR-IN-INTEREST, DBA AND FKA PETERBILT MOTORS COMPANY AND
21  KENWORTH; PAGE GROUP HOLDINGS, INC.; PARKER-HANNIFIN
22  CORPORATION, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO SACOMO
23  SIERRA AND SACOMO MANUFACTURING COMPANY; PATTERSON PUMP
24  COMPANY, INDIVIDUALLY, AS PARENT ALTER EGO AND SUCCESSOR-IN-
25  INTEREST TO C.H. WHEELER; PLANT PRODUCTS & SUPPLY CO.; PNEUMO-ABEX
26  LLC, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO ABEX
27  CORPORATION; SEPCO CORPORATION; SOCO-WEST, INC. FKA BRENNTAG
28  WEST, INC. FKA SOCO-LYNCH CORPORATION, INDIVIDUALLY AND AS

1 | SUCCESSOR-IN-INTEREST TO WESTERN CHEMICAL & MANUFACTURING
2 | COMPANY; TEREX CORPORATION; UNION CARBIDE CORPORATION;
3 | VIACOM, INCORPORATED AS SUCCESSOR-BY-MERGER TO CBS CORPORATION
4 | FKA WESTINGHOUSE ELECTRIC CORPORATION; WEIL PUMP COMPANY;
5 | WEIL PUMP COMPANY INC.; WESTERN STATES EQUIPMENT COMPANY,
6 | INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO WESTERN EQUIPMENT
7 | COMPANY; YARWAY CORPORATION AND THE FIRST DOE THROUGH THREE
8 | HUNDREDTH DOE, inclusive, are corporations organized and existing under and by virtue of
9 | the laws of the State of California, or the laws of some state or foreign jurisdiction, and that said
10 | defendants were and are authorized to do and are doing business in the State of California, and
11 | that said defendants have regularly conducted business in the County of Alameda, State of
12 | California. The defendants identified in this paragraph are collectively hereinafter referred to as
13 | "ASBESTOS DEFENDANTS".

14 |     4.        At all times herein mentioned, each of the ASBESTOS DEFENDANTS was the
15 | successor, successor in business, successor in product line or a portion thereof, parent, subsidiary,
16 | wholly or partially owned by, or the whole or partial owner of or member in an entity researching,
17 | studying, manufacturers, fabricating, designing, labeling, assembling, distributing, leasing,
18 | buying, offering for sale, selling, inspecting, servicing, installing, contracting for installation,
19 | repairing, marketing, warranting, rebranding, handling, modifying, scraping, disturbing,
20 | manufacturing for others, packaging and/or advertising a certain substance the generic name for
21 | which is asbestos, and other products containing said substance. Said entities shall hereinafter
22 | collectively be called "alternate entities". Each of the herein named ASBESTOS
23 | DEFENDANTS are liable for the tortuous conduct of each successor, successor in business,
24 | successor in product line or a portion thereof, assign, predecessor, predecessor in business,
25 | predecessor in product line or a portion thereof, parent, subsidiary, alter-ego, whole of partial
26 | owner, or wholly or partially owned entity, or entity that it as a member of, or funded, that
27 | researched, studied, manufactured, fabricated, designed, labeled, assembled, distributed, leased,
28 | bought, offered for sale, sold, inspected, serviced, installed, contracted for installation, repaired,

1   marketed, warranted, rebranded, manufactured for others and advertised a certain substance, the

2   generic name of which is asbestos, and other products containing said substance. The following

3   **ASBESTOS DEFENDANTS**, and each of them, are liable for the acts of each and every

4   "alternate entity", and each of them, in that there has been a virtual destruction of Plaintiffs

5   remedy against each such "alternate entity"; **ASBESTOS DEFENDANTS**, and each of them,

6   have acquired the assets, product line, or apportion thereof, of each such "alternate entity";

7   **ASBESTOS DEFENDANTS**, and each of them, caused the destruction of Plaintiffs remedy

8   against each such "alternate entity"; each such **ASBESTOS DEFENDANTS** has the ability to

9   assume the risk-spreading role of each such "alternate entity"; and that each such **ASBESTOS**

10   **DEFENDANTS** enjoys the goodwill originally attached to each such "alternate entity".

11   DEFENDANT      ALTERNATE ENTITY

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| BORG-WARNER CORPORATION | BORG-WARNER MORSE TEC INC. |
| CRANE CO. | CHAPMAN VALVE CO. |
| CROWN, CORK & SEAL | MUNDET CORK |
| DAIMLER TRUCKS NORTH AMERICA LLC | FREIGHTLINER TRUCKS DIVISION |
| FLOWSERVE CORPORATION | PACIFIC PUMP |
| GARLOCK SEALING TECHNOLOGIES LLC | GARLOCK, INC. |
| HITACHI CONSTRUCTION TRUCK MANUFACTURING LTD. | EUCLID-HITACHI HEAVY EQUIPMENT, LTD |
| HONEYWELL INTERNATIONAL, INC. | ALLIED SIGNAL INC., INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO THE BENDIX CORPORATION |
| IMO INDUSTRIES, INC. | IMO DELAVAL INC. |
| KAMAN INDUSTRIAL TECHNOLOGIES CORPORATION | WINN SUPPLY COMPANY |
| PACCAR, INC. | PETERBILT MOTORS COMPANY AND KENWORTH |

6
COMPLAINT FOR DAMAGES

| | |
|---|---|
| PARKER-HANNIFIN CORPORATION | SACOMO SIERRA AND SACOMO MANUFACTURING COMPANY |
| PATTERSON PUMP COMPANY | PARENT ALTER EGO AND SUCCESSOR-IN-INTEREST TO C.H. WHEELER |
| PNEUMO-ABEX LLC | ABEX CORPORATION |
| SOCO-WEST, INC. | BRENNTAG WEST, INC. FKA SOCO-LYNCH CORPORATION, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO WESTERN CHEMICAL & MANUFACTURING COMPANY |
| VIACOM, INCORPORATED | CBS CORPORATION FKA WESTINGHOUSE ELECTRIC CORPORATION |
| WESTERN STATES EQUIPMENT COMPANY | WESTERN EQUIPMENT COMPANY |

## FIRST CAUSE OF ACTION-NEGLIGENCE

### (Personal Injuries)

*PLAINTIFF WILLIAM HIGGINS COMPLAINS OF DEFENDANTS, AND EACH OF THEM AND FOR A CAUSE OF ACTION FOR NEGLIGENCE (PERSONAL INJURIES) ALLEGES:*

5.      Plaintiff realleges and incorporates herein by reference each of the proceeding paragraphs of this Complaint.

6.      Plaintiff WILLIAM HIGGINS alleges exposure to asbestos at jobsites which include but are not limited to the following:

| Employer & Dates | Jobsite(s) | Job Duties |
|---|---|---|
| U.S. Navy 1973 – 1977 | USS Turner Joy DD951; USS Hull DD 945; San Diego, CA; Long Beach, CA; Subic Bay, Philippines | Boiler Technician |

7

COMPLAINT FOR DAMAGES

| **JR Simplot** 7/1977 – 10/1977 Spring & Summer 1978 | Soda Springs, ID | Drill Helper |
|---|---|---|
| **Stauffer Chemical** 1979 – 1982 | Soda Springs, ID | Heavy Equipment Operator |
| **Self Employed** 1982 – 1983 | Soda Springs, ID | Driver, Truck Maintenance |
| **Roseburg Lumber** 1983 – 1984 | Roseburg, OR | Truck Driver |
| **Energy Express** 1984 – 1987 | Salt Lake City, UT | Petroleum Transport Driver |
| **Timber Products Trucking/TP Trucking** 1987 – 2001 | Central Point, OR | Lumber/General Flatbed Freight |
| **Arby Browns** 2002 – 2003 | Central Point, OR | Driver |
| **Norman Distribution** 3/2003 – 1/2009 | Phoenix, OR | Driver |
| **Colvin Oil** 1/2009 – 10/2009 | Grants Pass, OR | Driver |

7. At all times herein mentioned, the **ASBESTOS DEFENDANTS** and each of them were engaged in the business of manufacturing, fabricating, designing, assembling, distributing, leasing, buying, selling, inspecting, servicing, repairing, distributing, modifying, handling, installing, contracting to install, removing, contracting to remove, disturbing, cutting, grinding, scraping, marketing, warranting and/or advertising a certain substance, the generic name of which is asbestos, and/or other products containing said substance, or are engaged in the business of manufacturing, fabricating, designing, assembling, distributing, selling, and marketing of safety equipment, including respiratory protective devices which were intended to block the entry of asbestos fibers into the bodies of workers who were exposed to asbestos in the workplace and other locations.

8.    At all times herein mentioned, the **ASBESTOS DEFENDANTS**, and each of them, singularly and jointly, negligently and carelessly researched, tested or failed to test, warned or failed to warn, manufactured and/or caused to be manufactured, designed, developed, distributed, supplied, removed, abated, tore out, drilled, dug out, threw away, discarded, swept up, labeled, advertised, marketed, warranted, inspected, repaired, installed, scraped, cut, ground, distributed, handled, fabricated, assembled, modified, serviced, and/or sold a certain substance, the generic name of which is asbestos, and/or other products containing said substance, and said substance was capable of causing and did, in fact, proximately cause personal injuries to users, consumers, workers and others, while being used in a manner reasonably foreseeable, thereby rendering said substances unsafe and dangerous for use by the consumers, users, bystanders or workers exposed thereto.

9.    At all times herein mentioned, the **ASBESTOS DEFENDANTS**, and each of them manufactured, distributed, sold and/or designed products to be used with asbestos, and/or other products containing said substance. Each **ASBESTOS DEFENDANT** manufactured, distributed, sold and/or designed products in such a manner that it required the regular replacement of asbestos and/or other materials containing asbestos. Moreover, each **ASBESTOS DEFENDANT** defectively designed, sold, manufactured and/or distributed products which caused the degradation of integrated asbestos-containing products, which contributed to Plaintiff's development of mesothelioma. This being so, even despite the fact that alternative feasible designs were available that would not cause degradation and release of asbestos fibers from the original and replacements asbestos materials to the same extent as the design chosen by **ASBESTOS DEFENDANTS**.

10.    It was foreseeable to each **ASBESTOS DEFENDANT** that the original asbestos and other materials containing asbestos would be removed and replaced with new asbestos and/or other materials containing asbestos during ordinary operation and maintenance. Indeed, during the time period in question, most if not all, replacement materials were comprised of asbestos. The operation, use and repair of each of the **ASBESTOS DEFENDANTS** products would affect both the original and replacement asbestos and other products containing asbestos by making them brittle, friable and not reusable. It was foreseeable to each **ASBESTOS DEFENDANT** that the

9

COMPLAINT FOR DAMAGES

1     process of removing asbestos materials incorporated into their products and replacing them with

2     new asbestos materials during ordinary repair and maintenance would disturb asbestos and result

3     in the release of asbestos fibers into the air, thereby exposing Plaintiff, other workers and

4     bystanders. Each **ASBESTOS DEFENDANT** failed to warn Plaintiff, other workers and

5     bystanders of the risks inherent in the replacement of asbestos containing parts and failed to warn

6     Plaintiff, other workers and bystanders that their product was designed to make asbestos friable.

7     11.      Plaintiff herein is a worker who for or during a substantial length of time used,

8     handled or has been otherwise exposed to the asbestos and asbestos products referred to herein in

9     a manner that was reasonably foreseeable.

10    12.      As a direct and proximate result of the conduct of the **ASBESTOS**

11    **DEFENDANTS**, and each of them, as aforesaid, the exposure to asbestos caused severe and

12    permanent malignant injuries to the Plaintiff, including, but not limited to, mesothelioma and other

13    lung damage.

14    13.      Plaintiff is informed and believes, and thereon alleges, that mesothelioma is a

15    progressive lung disease caused by inhalation of asbestos fibers without perceptible trauma and

16    that said disease results from exposure to asbestos and asbestos products over a period of time.

17    14.      Plaintiff presently believes that he suffers from a medical condition known as

18    mesothelioma, a lung disease related to the exposure to asbestos. Plaintiff was not aware that

19    exposure to asbestos presented any risk of injury and/or disease to him, and had not been advised

20    or informed by anyone that he could contract any disease, sickness or injury as a result of working

21    in the vicinity of asbestos.

22    15.      As a direct and proximate result of the aforesaid conduct of **ASBESTOS**

23    **DEFENDANTS**, and each of them, Plaintiff is dying and has suffered, and continues to suffer

24    permanent malignant and non-malignant injuries to his person, body and health, including but not

25    limited to mesothelioma, other lung damage, all to his general damages in a sum invoking the

26    unlimited jurisdiction of the Court.

27    16.      As a direct and proximate result of the aforesaid conduct of the **ASBESTOS**

28    **DEFENDANTS**, and each of them, Plaintiff has incurred, is presently incurring and will incur in

1  the future, liability for physicians, surgeons, nurses, hospital care, medicine, hospitals, x-rays and

2  other medical treatment, the true and exact amount thereof being unknown to Plaintiff at this time,

3  and Plaintiff prays leave to amend this Complaint accordingly when the true and exact cost thereof

4  is ascertained.

5      17.    Plaintiff WILLIAM HIGGINS has lost pre-judgment interest pursuant to Civil

6  Code Section 3288, the exact amount of which Plaintiff prays leave to insert herein when finally

7  ascertained.

8      18.    In researching, testing, manufacturing, distributing, labeling, and marketing said

9  products, **ASBESTOS DEFENDANTS** in this cause of action named, and each of them, did so

10 with conscious disregard for the safety of the users of said products, in that **ASBESTOS**

11 **DEFENDANTS** had specific prior knowledge that there was a high risk of injury or death

12 resulting from exposure to asbestos or asbestos products, including but not limited to

13 mesothelioma. Said knowledge was obtained, in part, from scientific studies, government data,

14 and medical data to which **ASBESTOS DEFENDANTS** had access, as well as scientific studies

15 performed by, at the request of, or with the assistance of, said **ASBESTOS DEFENDANTS**, and

16 which knowledge was obtained by said **ASBESTOS DEFENDANTS** on or before 1933, and

17 thereafter.

18     19.    On or before 1933, and thereafter, said **ASBESTOS DEFENDANTS** were aware

19 that users of asbestos and asbestos products, as well as members of the general public who would

20 be exposed to asbestos and asbestos products, had no knowledge or information indicating that

21 asbestos could cause injury, and said **ASBESTOS DEFENDANTS** knew that the users of

22 asbestos and asbestos products, as well as members of the general public who were exposed to

23 asbestos and asbestos products, would assume, and in fact did assume, that exposure to asbestos

24 and asbestos products was safe, when in fact said exposure was extremely hazardous to human

25 life.

26     20.    With said knowledge, said **ASBESTOS DEFENDANTS** opted to manufacture and

27 distribute said asbestos and asbestos products without attempting to protect users from or warn

28 users of, the high risk of injury or death resulting from exposure to asbestos and asbestos products.

1   Rather than attempting to protect users and workers from, or warn workers and users of, the high

2   risk of injury or death resulting from exposure to asbestos and asbestos products, **ASBESTOS**

3   **DEFENDANTS** intentionally failed to reveal their knowledge of said risk, fraudulently,

4   consciously and actively concealed and suppressed said knowledge from members of the general

5   public that asbestos and asbestos products were unsafe for all reasonably foreseeable use, with the

6   knowledge of the falsity of said implied representations.

7       21.    The above referenced conduct of said **ASBESTOS DEFENDANTS** was

8   motivated by the financial interest of said **ASBESTOS DEFENDANTS** in the continuing,

9   uninterrupted distribution and marketing of asbestos and asbestos products. In pursuance of said

10  financial motivation, said **ASBESTOS DEFENDANTS** consciously disregarded the safety of the

11  users of, and persons exposed to, asbestos and asbestos products, and were in fact, consciously

12  willing to permit asbestos and asbestos products to cause injury to workers and users thereof, and

13  persons exposed thereto, including Plaintiff.

14      22.    As the above referenced conduct of said **ASBESTOS DEFENDANTS** was and is

15  vile, base, willful, malicious, fraudulent, oppressive, outrageous, and in conscious disregard and

16  indifference to the safety and health of workers exposed to asbestos and asbestos products,

17  including Plaintiff, Plaintiff, for the sake of example, and by way of punishing said **ASBESTOS**

18  **DEFENDANTS**, seeks punitive damages according to proof.

19      WHEREFORE, Plaintiff prays judgment against **ASBESTOS DEFENDANTS**, and each

20  of them, as hereafter set forth.

21                         **SECOND CAUSE OF ACTION - STRICT LIABILITY**

22      *AS AND FOR A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION*

23  *FOR STRICT LIABILITY, PLAINTIFF COMPLAINS OF THE* **ASBESTOS DEFENDANTS**

24  *AND EACH OF THEM, AND ALLEGES AS FOLLOWS:*

25      23.    Plaintiff realleges and incorporates herein by reference each of the proceeding

26  paragraphs of this Complaint.

27      24.    **ASBESTOS DEFENDANTS** and each of them, researched, manufactured, tested

28  or failed to test, warned or failed to warn, designed, labeled, distributed, advertised, marketed,

warranted, distributed, handled, installed, modified, scraped, inspected, repaired, offered for sale and sold a certain substance, the generic name of which is asbestos and other products containing said substance, which substance is defective, in that same was capable of causing and did, in fact, cause personal injuries, including mesothelioma and other lung damage, to the users and consumers thereof while being used in a reasonably foreseeable manner, thereby rendering the same unsafe and dangerous for use by consumers, users, bystanders and workers exposed thereto; said **ASBESTOS DEFENDANTS**, and each of them, further failed to adequately warn of the risks to which Plaintiff and others similarly situated were exposed.

25.     At all times herein mentioned, the **ASBESTOS DEFENDANTS**, and each of them were aware that the original gaskets and packing supplied with their equipment would need to be removed and replaced with new gaskets and packing during ordinary operation and maintenance of their equipment. Heat and pressure generated by operation would affect the original and replacement gaskets and packing - e.g., making them brittle, friable and not reusable, making replacement necessary and dangerous. It was foreseeable that the process of removing old gaskets and packing, and replacing them with the new materials during ordinary maintenance operations would disturb the asbestos materials, releasing asbestos into the air.

26.     As a direct and proximate result thereof, Plaintiff has suffered the injuries and damages as previously set forth including those alleged in the First and Second Causes of Action, inclusive.

## THIRD CAUSE OF ACTION – LOSS OF CONSORTIUM

*AS AND FOR A FURTHER, THIRD, SEPARATE AND DISTINCT CAUSE OF ACTION FOR LOSS OF CONSORTIUM, PLAINTIFF ANTOINETTE HIGGINS COMPLAINS OF* **ASBESTOS DEFENDANTS** *AND EACH OF THEM AND ALLEGES AS FOLLOWS:*

27.     Plaintiff ANTOINETTE HIGGINS incorporates herein by reference and makes a part hereof as though fully set forth herein, in the First and Second Causes of Action of this Complaint.

28.     Plaintiff ANTOINETTE HIGGINS is now, and at times herein mentioned, the lawfully wedded spouse of WILLIAM HIGGINS.

13
COMPLAINT FOR DAMAGES

29. As a direct and proximate result of the acts of **ASBESTOS DEFENDANTS**, and each of them, as set forth and incorporated herein by reference, and the severe injuries caused thereby to WILLIAM HIGGINS as alleged in his Complaint, Plaintiff ANTOINETTE HIGGINS has suffered, and for a long period of time will continue to suffer loss of consortium, including but not by way of limitation, loss of services, marital relations, society, comfort, companionship, love and affection of her said spouse, and has suffered severe mental and emotional distress and general nervousness as a result thereof.

30. Plaintiff ANTOINETTE HIGGINS, as a result of the foregoing described injuries to her said spouse, has been generally damaged in a sum in excess of the jurisdictional limits of the Municipal Court.

WHEREFORE, Plaintiffs WILLIAM HIGGINS AND ANTOINETTE HIGGINS pray judgment against **ASBESTOS DEFENDANTS**, and each of them, as follows:

1. For Plaintiffs' general damages according to proof;

2. For Plaintiff WILLIAM HIGGINS' medical and related expenses according to proof;

3. For Plaintiffs' prejudgment interest according to proof, pursuant to Civil Code section 3288;

4. For loss of income according to proof;

5. For Plaintiffs' costs of suit herein;

6. For loss of care, comfort and society;

7. As to those **ASBESTOS DEFENDANTS** named in the First Cause of Action, for exemplary or punitive damages according to proof; and

8. For such other and further relief as this Court deems just and proper.

DATED: December 16, 2009

LEVIN SIMES KAISER & GORNICK, LLP

By: _____
L. SCOTT HAMES
Attorneys for Plaintiffs

14

COMPLAINT FOR DAMAGES

1　MICHAEL J. PIETRYKOWSKI (SBN: 118677)
　　JAMES SCADDEN (SBN 090127)
2　GLEN R. POWELL (SBN: 219453)
　　GORDON & REES LLP
3　Embarcadero Center West
　　275 Battery Street, Twentieth Floor
4　San Francisco, CA 94111
　　Telephone: (415) 986-5900
5　Facsimile: (415) 986-8054

6　Attorneys for Defendant
　　LESLIE CONTROLS, INC.

7

8

9　　　　　　UNITED STATES DISTRICT COURT

10　　　　FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

12

13　BILLY RICHARD FOLSTON and　　　) Los Angeles Superior Court Case No.
　　MARGARET FOLSTON,　　　　　　　) BC 416685
14　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
15　　　　　　　　　Plaintiffs,　　　　　) DECLARATION OF RET.
　　　　　　　　　　　　　　　　　　　　) ADMIRAL ROGER B. HORNE IN
16　　　　　　　v.　　　　　　　　　　　) SUPPORT OF REMOVAL FROM
　　　　　　　　　　　　　　　　　　　　) STATE COURT TO FEDERAL
17　ALFA LAVAL, INC. (individually and　) COURT OF DEFENDANT
　　as successor-in-interest to THE　　　) LESLIE CONTROLS, INC.
18　DELAVAL SEPARATOR COMPANY),)
　　et al.,　　　　　　　　　　　　　　　)
19　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Defendants.　　　　　)
20

21

22　　　　I, Roger B. Horne, Jr., being under penalty of perjury, declare and say:

23　　　　1.　　I am a retired Rear Admiral of the United States Navy, in which I
　　served between 1956 and 1991.

24　　　　2.　　I began my Navy career in 1956, immediately after receiving a

25　Bachelor of Science degree in Naval Engineering from the United States Naval

26　Academy at Annapolis, Maryland. I have also received extensive post-graduate

27　education in naval engineering, including a Master of Science Degree in

28

　　　　　　　　　　　　　　　　　　-1-
　　　　　　DECLARATION OF RET. REAR ADMIRAL ROGER B. HORNE

1   Mechanical Engineering from the U.S. Naval Postgraduate School, and have taught
2   Naval Engineering as a Visiting Professor at the University of Michigan.
3   Throughout my Navy career, I concentrated in areas of ship design, engineering,
4   construction, overhaul and inspection. Ultimately, I achieved the rank of Chief
5   Engineer and Deputy Commander, Naval Sea Systems Command ("NAVSEA") for
6   Ship Design and Engineering. Prior to that, I served as Deputy Commander,
7   NAVSEA for Facilities and Industrial Management; Commander, Puget Sound
8   Naval Shipyard; Commander, Engineering Duty Officer School; Production and
9   Repair Officer, Mare Island Naval Shipyard; Nuclear Engineering Manager, Puget
10  Sound Naval Shipyard; Nuclear Submarine Inspection Officer, Supervisor of
11  Shipbuilding Office, Ingalls Shipyard and Chief Engineer in the USS Ozboum (DD
12  846).

13       3.      In addition to my training and experience in Navy ship construction,
14  as outlined above, I have been recognized for achievements in the field of marine
15  machinery and engineering, and have received three Navy Legion of Merit Awards
16  and three Meritorious Service Awards for Engineering and Industrial Achievement
17  and an award from the Marine Machinery Association.

18       4.      I submit this Affidavit in support of defendant Leslie Controls, Inc.'s
19  ("Leslie") Notice of Removal to attest to the level of supervision, direction and
20  control exercised by the U.S. Navy over the design and manufacture of equipment,
21  including valves, intended for installation on Navy vessels. In addition, I have
22  personal knowledge of the comprehensive plans, specifications and requirements
23  which governed suppliers like Leslie of equipment for use aboard Navy ships.
24  More particularly, I can attest that any and all work performed on valves built and
25  supplied for these ships by vendors such as Leslie was performed to the
26  requirements specified by the Navy, and that the work was reviewed and inspected
27  by Navy personnel in the vendor's plant. In many instances during my career I
28  personally inspected equipment, including valves, to verify conformance with the

-2-
DECLARATION OF RET. REAR ADMIRAL ROGER B. HORNE

1  requirements specified, although more immediate supervision typically was
2  exercised by officers and other Navy personnel under my command or the
3  command of NAVSEA or its predecessor, the Bureau of Ships ("BUSHIPS").

4      5.   Valves built for Navy vessels, including Leslie valves, were
5  manufactured according to detailed specifications prepared, written, approved and
6  issued exclusively by the Navy, specifically NAVSEA or BUSHIPS. In my role as
7  Chief Engineer and Deputy Commander for NAVSEA's Ship Design and
8  Engineering Division, I was personally responsible to the Commander of NAVSEA
9  for developing ship designs and providing overall technical support to the
10  operating fleet, including technical support for the maintenance of Navy ships, and
11  Navy ships under construction. I was also responsible for maintaining naval ship
12  military specifications and for monitoring compliance with the specifications by all
13  vendors and contractors of naval equipment. I am fully aware that only valves
14  especially designed and built for U.S Navy combat vessels, including Leslie valves
15  could be installed.

16      6.   The Navy chain of command concerning ship construction involves
17  several layers of authority related to technical and contractual control over Navy
18  shipbuilding. The Secretary of the Navy [subject to the President and Congress]
19  has ultimate authority over the Navy and Navy shipbuilding; immediately below
20  the Secretary, as has been the case since the creation of NAVSEA, is the Chief of
21  Naval Operations ("CNO"), to whom NAVSEA reports. Prior to the establishment
22  of NAVSEA, BUSHIPS controlled all combat ship design and construction and
23  reported to the CNO as well as a civilian Assistant Secretary. Since the creation of
24  NAVSEA, NAVSEA reports to the CNO for all military ship design and
25  construction. (See Exhibit A & B.)

26      7.   Under the command of NAVSEA, as was the case with BUSHIPS, the
27  Navy's shipbuilding structure was comprised of several divisions and levels of
28  authority concerning ship design, construction, repair and inspection. Technical

-3-
DECLARATION OF RET. REAR ADMIRAL ROGER B. HORNE

1  and contractual control over shipboard equipment and material was directed by the
2  Commander of Naval Sea Systems and the Commander of Naval Supply. Each of
3  these two organizations had oversight responsibility concerning, among other
4  things, valves built for Navy vessels. Compliance with the standards and
5  specifications required for valves built for Navy use was directly monitored by
6  Naval Machinery Inspectors under both of these divisions: the Machinery
7  Inspectors under Naval Supply worked on-site at the vendor's (in this case Leslie
8  Controls, Inc. s') manufacturing facility, and the Machinery Inspectors under Naval
9  Sea Systems Commands carried out their responsibilities at the shipbuilding yards.
10  Moreover, it was common in my experience for Directors of the Machinery and
11  Propulsion Equipment Groups, who worked for me at times during my career, to
12  inspect the manufacturing process at vendors' plants.

13      8.      In my experience, it was the Machinery Inspectors who exercised
14  primary, frontline control over the work performed for the Navy and government
15  shipyards and governments contract shipyards by vendors such as Leslie in the
16  production of valves and other equipment. The Naval Machinery Inspectors were
17  responsible for assuring that contractors such as Leslie followed the required
18  contract specifications as they relate to naval machinery. Further, the Naval
19  Machinery Inspectors would report to their superiors any violations or failures to
20  comply with specifications.

21      9.      The Navy retained the "final say" over the design of any piece of
22  equipment, and made the ultimate decision regarding how to resolve an
23  engineering disagreement between the Navy and an outside supplier.

24      10.     Equipment sold by Leslie during the 1940's, 1950's and 1960's to the
25  United States Navy for use on U.S. Navy ships was always required to comply
26  with the detailed specifications issued by the government. For example, attached
27  as Exhibit C is a copy of the 1968 Military Specification (MilSpec MIL –G -
28  21032, "Gaskets, Metallic Asbestos, Spiral Wound". These specifications dictated

-4-
**DECLARATION OF RET. REAR ADMIRAL ROGER B. HORNE**

1 | the materials that Leslie was required to use in component parts in the equipment.
2 | These specifications were made part of the contract, and strict compliance
3 | therewith was mandatory.

4 | 11. In addition, I can attest that the military specifications for valves and
5 | other equipment intended for use aboard Navy vessels were drafted, approved and
6 | maintained by the Navy, specifically NAVSEA, to address all aspects of shipboard
7 | equipment and materials requirements, including the materials to be used, and any
8 | changes to these specifications were made by the Navy. NAVSEA maintained and
9 | controlled the MilSpecs largely because it had superior knowledge of the demands
10 | and requirements of combat-ready vessels. NAVSEA or BUSHIPS also prepared
11 | contract specifications which incorporated the MilSpecs. These specifications
12 | reflected the state of the art and the special needs of combat vessels destined for
13 | combat with our sailors.

14 | 12. The Navy had unique specifications for valves. The specifications
15 | were communicated to valve vendors such as Leslie when the Navy (directly or
16 | through its contractors) issued its Request for Proposal for certain equipment.

17 | 13. The Navy specifications also covered the nature of any
18 | communication affixed to valves or other equipment supplied to the Navy. The
19 | Navy could not, and did not, permit its contractors to implement any changes
20 | because every aspect of every item of equipment had to be: (1) functionally
21 | compatible with every other equipment and with available materials from the Navy
22 | Supply System; (2) compatible with shipyard practices, training, tools and
23 | capabilities; and (3) consistent with the ability of the crew to maintain the ship
24 | during its service when shipyard help was unavailable using materials carried
25 | onboard.

26 | 14. The Navy would not, and could not permit an equipment
27 | manufacturer or supplier to interfere with the Navy's mission by placing warnings
28 | on any equipment (or in any instructions or manuals which accompanied the

-5-

**DECLARATION OF RET. REAR ADMIRAL ROGER B. HORNE**

1  equipment) on any U.S. Navy ships or in any shipyards in which U.S. Navy ships
2  were built or repaired that might cause sailors or workers to deviate from their
3  mission or require the U.S. Navy to devote scarce resources to programs it deemed
4  non-essential, in its unilateral view.

5        15.     The Navy had complete control over every aspect of each piece of
6  equipment. Military specifications governed every characteristic of the equipment
7  used on Navy ships, including the instructions and warnings. Drawings for
8  nameplates, texts of instruction manuals, and every other document relating to
9  construction, maintenance and operation of the vessel was approved by the Navy.
10 This control included the decision of what warnings should or should not be
11 included. Thus, the Navy controlled the decision making with respect to
12 instructions and warnings on every piece of equipment.

13       16.     In addition to specifications regarding design and manufacturing of
14 the equipment itself, the Navy also had detailed specifications that governed the
15 form and content of written materials to be delivered with equipment, including
16 valves, supplied to the Navy. The Navy was intimately involved with and had final
17 approval of all technical and engineering drawings, operating manuals, safety or
18 hazard information and any other written information that accompanied a piece of
19 equipment. The Navy determined the nature of hazards to be subject to any
20 precautionary labeling and the content of any such labeling. In short, the Navy
21 dictated every aspect of the design, manufacture, installation, overhaul, written
22 documentation and warnings associated with its ships and did not permit deviation
23 from any of its contractors.

24       17.     In conclusion, in each and every instance where Leslie contracted
25 with the U.S. Navy for the provision of equipment, the U.S. Navy exercised
26 direction and control over the design, manufacture, inspection and testing of all
27 such equipment. Pursuant to the terms of all contracts with Leslie entered with the
28 U.S. Navy, the Navy retained authority to direct and control the performance under

-6-
DECLARATION OF RET. REAR ADMIRAL ROGER B. HORNE

1 | the terms of the contract.

2 |     I declare under penalty of perjury under laws of the State of Washington that

3 | the foregoing is true and correct, and that if called as a witness, I could

4 | competently testify to the foregoing facts, all of which are within my own personal

5 | knowledge.

6 |     Executed this _3rd_ day of August 2009, at

7 | _Seabeck, WA_ .

8 |

9 |

10 | Roger B Horne
                 ROGER B. HORNE, JR.

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

LECO/1058642/6803229v 1

-7-

**DECLARATION OF RET. REAR ADMIRAL ROGER B. HORNE**

# EXHIBIT A



# Technical and Contractual Control

## Recent Organization

Secretary of the Navy

Chief of Naval Operations

Commander Naval Sea Systems

Commander Naval Supply

Deputy Commander for Ship Design and Ship Systems Engineering

Deputy Commander for Facilities and Industrial Management

Resident Contract Administration Offices

Director Machinery Group

Supervisor of Ship Building Offices

Machinery Inspectors

Director Propulsion Equipment

Supply Department

Inspection Department

Head Steam Turbine Branch

Naval Machinery Inspectors

EXHIBIT

# EXHIBIT B

### Definition of Key Position Responsibilities

Chief of Naval Operations (CNO):  Overall responsibility for accomplishment of the mission of the Navy in the defense of the United States.  This includes recommendations for the Naval ship building programs and the readiness of the Operating forces to meet the threat at hand.

Commander of the Naval Sea Systems Command (COMNAVSEA): Responsible to the CNO for technical support of Naval ships, ship designs, and ship construction. Responsible for management of the Naval Shipyards and contract administration of ships under construction in private yards.

Deputy Commander for Ship Design and Ship Systems Engineering:  Responsible to COMNAVSEA and specific project officers for developing ship designs and for overall technical support to the operating fleet, maintenance of ships, and ships under construction.  Responsible for the maintenance of Naval ship military specifications.  Monitors contractor performance to requirements in the development of new naval machinery being built to specifications developed by his design personnel.

Director of the Machinery Group: Responsible to the Deputy Commander for Ship Design and Ship Systems Engineering for technical support of projects involving ship machinery.  This includes the development of new designs as well as support of on going ship construction and ships in maintenance and at sea. Responsible for the maintenance of military specifications related to naval machinery.  Naval machinery involves auxiliary machinery, as well as, propulsion machinery.

Director of the Propulsion Branch:  Responsible to the Director of the Machinery Group for propulsion machinery.  Is responsible for the technical effort associated with the development and integration of new propulsion systems into ship designs and related support to the operating fleet.  Propulsion systems involve steam, diesel and gas turbine.  Has cognizance of specifications related to propulsion systems.

Head Steam Turbine Branch:  Responsible to the Director of the Propulsion Branch for the development on naval turbines and maintenance of life cycle technical support of turbines used in ship designs.  Responsible for the maintenance of and designation of specifications to be used in turbine designs being developed by contractors.

Deputy Commander for Facilities and Industrial Management:  Responsible to COMNAVSEA for oversight of the Naval Shipyards and the Supervisor of Shipbuilding offices located in the private shipyards where naval ships are under construction.

EXHIBIT

Hecht 3

Supervisor of Shipbuilding(SUPSHIP): Responsible to COMNAVSEA via the Deputy
Commander for Facilities and Industrial Management for the administration of the
ship building contracts in the shipyard(s) he is responsible for. Assures ships are
built to required specifications. Approves changes to specifications as authorized
by the appropriate cognizant NAVSEA technical code and Project Officer.

Head Inspection Department: Responsible to the Supervisor of Shipbuilding for the
inspection of Naval ships under construction in the shipyard. Assures by on scene
inspections and audits that the navy specifications for the ship are followed.
Comments on contractor requests for changes in the contract specifications as
requested by other SUPSHIPS departments. Is not authorized to change
specifications.

Naval Machinery Inspectors: Specialized inspectors qualified in Naval machinery that
are responsible to the Head of the Inspection Department for assuring the,
contractor follows the required contract specifications as they relate to Naval
machinery. Inspects ship installations and received material from subcontractors
including government furnished material such as propulsion equipment. Reports
violations to specifications.

Head Contracts/Supply Dept. Progresses government furnished material and manages
contract changes. Is authorized after appropriate technical and project
management approval to sign contract change documents.

Commander Naval Supply System (COMNAVSUP): Is responsible to the Chief of
operations for supply support of the operating fleet and supply functions related to
the shipbuilding programs. This includes the maintenance and distribution of
repair parts for ships at sea.

Resident Contract Administration Offices: Located in the manufacturing plants of
contractors under contract with the US Navy to supply equipment. In some cases
equipment is under development. Offices are responsible to COMNAVSUP for
assurance that equipment is built to the contract technical specifications. In the
case of naval machinery these are specified by NAVSEA. Takes part in visits by
the Deputy Commander for Ship Design and Ship Systems Engineering to assure
contractor performance. Does not have the authority to allow contractor change
to technical specifications without approval from NAVSEA and proper contract
modification.

Machinery Inspectors: Depending on the size and complexity of contracts administered
the resident Office may have a staff of inspectors some of which specialize in
certain areas such as propulsion machinery. These inspectors follow the
contractor's effort and formally report violations to specifications.

### Ship Design and Naval Machinery Military Specifications

Certain military specifications relate to ship and ship equipment. These are maintained by the Naval Sea Systems Command (NAVSEA) formerly the Bureau of Ships. NAVSEA has in its command engineers highly qualified in specialty areas such as steam turbines, gas turbines, reductions gears etc. These engineers have control over the military specifications that concern their area of expertise. In addition, NAVSEA has had an Engineering Standards Sub Group and a Combatant Ship Specifications and General Specifications Division to help manage the large number of specifications (thousands) and contract plans that exist. Changes to specifications are continually under review as new technology and construction techniques evolve.

Changes to specifications must be coordinated with the cognizant technical engineer. Once a contract which references certain specifications is signed with a contractor the cognizant engineer will resolve any questions of interpretations. There must be clear assignment of responsibility for resolving questions. If this does not occur, different interpretations are liable to occur. Once a specification is invoked in a contract no technical changes can be made that violate that specification without the cognizant engineers review.

The reasons for such control is that specifications are frequently very subtle and what is perceived as a minor change can have a disastrous impact. The safety and effectiveness of combatant ships depends to a large extent on adherence to specifications that have evolved by a process of experience and technology advancement. Since ships are very complex, and subject to various opinions as to what are proper requirements, special care is taken to assure proper technical reviews are made before any waivers to the specifications are approved. Such changes are formal, that is in writing.

### The Ship Design/Construction Process

Once a ship is to be designed there are four design phases that take place: feasibility design, preliminary design, contract design and detailed design. A Ship Design and Engineering Director is assigned along with support from cognizant technical codes.

During the feasibility design phase the outlines of several ship configurations will be considered. For the machinery plant, different types of propulsion plants will be considered, and an outline of the space and weight required for each plant determined. There are now four basic plants and several combinations plants that can be put together.

Once a ship concept has been selected as a result of the feasibility study the preliminary design phase will be started. This design phase is done by NAVSEA and results in an engineering description of the ship and its major subsystems. Performance characteristic


EXHIBIT
Heins 4

and system diagrammatics are developed during this phase. During this phase, for the machinery plant, each cognizant engineer will do tradeoff studies to determine the best combination of machinery that can be used.

Following the preliminary design phase is the contract design phase. During this phase the designers develop a technical package of drawings and specifications that the various shipbuilders can bid on. This process is done in great detail and the cognizant engineers use the appropriate specifications and contract plans at their disposal to convey to the prospective builders how the ship will be built. By using the contract specifications incorporated during the contract design phase NAVSEA solicits for bids to perform the detail design and ship construction. In some cases detail design or part of it may not be done by the final ship builder selected.

During the detail design phase NAVSEA does not relinquish control. NAVSEA is involved in the development and purchasing of government furnished equipment such as the that used in the propulsion plant. They will review and approve change proposals to specifications and monitor progress and performance to requirements in detail through design reviews, by visits to the design agency, and by approving plans and calculations that have been developed.

Once construction of the ship has been started or new machinery development started by a contractor NAVSEA (the Engineering Directorate) will continue to monitor performance by on site visits and reviews to assure work is proceeding in a proper manner, as specified, and to resolve any technical problems that might come up. Any technical changes to the specifications are reviewed for approval by NAVSEA.

# EXHIBIT C

5-23-77

QUALIFIED PRODUCTS LIST
OF
PRODUCTS QUALIFIED UNDER MILITARY SPECIFICATION

| | | | |
|---|---|---|---|
| | | | |

1752

EXHIBIT
70.177

28175

SUPERSEDED

QPL-23658-7
25 November 1946
SUPERSEDING
QPL-23658-6
4 August 1946

QUALIFIED PRODUCTS LIST
OF
PRODUCTS QUALIFIED UNDER MILITARY SPECIFICATION
MIL-G-23658

GARMENT, RUBBER...

| COMPONENT DESIGNATION | MANUFACTURER'S DESIGNATION | USE OR CONSTRUCTION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| TYPE II Series 100 thru 800 inclusive | Dshrbslliz | NSN 9862 | Anchor Packing Company ... Philadelphia 5, Pa. ... |
| Series 200 thru 600 inclusive | AJAX | NSN DRLR6 | Durkon Packing & Rubber Co. ... Philadelphia, Pa. 19137 ... |
| Series 300 thru 600 inclusive | Plastibllis | NSN 9863 | Plastibllis Gasket Co. ... Camden, New Jersey ... |
| Series 100 thru 640 inclusive | Guardian 546 | NSN GLRLR6 | Garlock, Inc. ... Palmyra, New York ... Camden, N. J. |
| Series 100 thru 800 inclusive | Style No. 915 | C-3570 | John-Manville Products Corp. ... New Brunswick, N. J. ... |

NOTE:  As of 25 November 1946, no Type IV Gaskets, Series 800, 1300, ...

SUPERSEDED



QPL-47204-8
2 January 1947
Superseding
QPL-23583-7
21 November 1945

## QUALIFIED PRODUCTS LIST
### OF
### PRODUCTS QUALIFIED UNDER MILITARY SPECIFICATION
### MIL-G-01208

GASKETS, METALLIC-ASBESTOS, SPIRAL WOUND
(FOR ASA CONNECTING FLANGES JOINTS IN PIPING SYSTEMS)

| COMPONENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST AND QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| TYPE IV<br>Series 200 thru 600<br>inclusive | Anhole311e | 202 9602 | Anchor Packing Company<br>408 N. Broad Street<br>Philadelphia 8, Pa.<br>(Distributor)<br>Plastkllic Gasket Co.<br>D Linden Street<br>Camden, New Jersey 08102<br>Plants Same address<br>(Manufacturer) |
| Series 150 thru 600<br>inclusive | A.N.I. | XXY 01216 | Belmont Packing & Rubber Co.<br>Butler and Sepulve Streets<br>Philadelphia, Pa. 19137<br>(Distributing)<br>Garlock, Inc.<br>Foundation Seal Mfg<br>Gastonia, N. C.<br>(Manufacturer) |
| Series 150 thru 600<br>inclusive | Plastkllic | X70 8082 | Plastkllic Gasket Co.<br>D Linden Street<br>Camden, New Jersey 08102<br>Plants Same address |
| Series 204 thru 604<br>inclusive | Garrison No. | 202 01218 | Garlock, Inc.<br>204 Main Street<br>Palmyra, New York 14522<br>Plants Foundation Seal Mfg.<br>Gastonia, N. C. |
| Series 150 thru 600<br>inclusive | Style No. 913 | G-1228 | John-Manville Products<br>Corp.<br>Garlok Gasket Branch<br>New Brunswick, N. J.<br>Plants Same address |

NOTE: As of 2 January 1949, no Type II Gaskets, Series 900, 1500, and 2500 have been tested and qualified under Military Specification MIL-G-01208. Pending the limitation of these series on the Qualified Products List, the qualification requirements (paragraphs 3.1 and 4.2) of Specification MIL-G-01208 shall be waived for procurement of Series 900, 1500 and 2500, Type II Gaskets.

---

# SUPERSEDED



MIL-G-21032-9
9 April 1960
SUPERSEDES
MIL-G-21032-8
8 January 1960

## QUALIFIED PRODUCTS LIST
### OF
### PRODUCTS QUALIFIED UNDER MILITARY SPECIFICATION
### MIL-G-21032

GASKETS, METALLIC-ASBESTOS, SPIRAL WOUND
(FOR USE COMMERCIAL PLUMBING JOINTS IN PIPING JOINTS)

This list has been prepared for use by or for the Government in the procurement of products covered by the subject specification and such listing of a product in not intended to and does not connote an indication that the product by the Department of Defense...

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR IDENTIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| TYPE II Series 150 thru 800 inclusive | Asbestolite | PTL 5005 | Anchor Packing Company 401 N. Broad Street Philadelphia 8, Pa. (distributor) Manhattan Gasket Co. B Linden Street Camden, New Jersey 08102 (Manufacturer) |
| Series 150 thru 600 inclusive | AMX | DCS 812826 | Belmont Packing & Rubber Co. Bethon and Haycliss Streets Philadelphia, Pa. 19127 (distributor) Garlock, Inc. Precision Seal Mfg. Garlock, N. C. (Manufacturer) |
| Series 700 thru 800 inclusive | Flexitallic | KDS 9885 | Flexitallic Gasket Co. 8 Linden Street Camden, New Jersey 08101 Plant: Same address |
| Series 150 thru 400 inclusive | Guardian 800 | KSI 010186 | Garlock, Inc. 800 Main Street Palmyra, New York 14022 Plant: Precision Seal Mfg. Garlock, N. C. |
| Series 150 thru 600 inclusive | Style No. 913 | C-3890 | Johns-Manville Sales Corp. 22 East 40th St. New York, N.Y. 10016 Plant: New Brunswick, N. J. |

NOTE: As of 9 April 1960, no Type II Gaskets, Series 900, 1500, and 2500 have been tested and qualified under Military Specification MIL-G-21032. Pending the inclusion of these under the Qualified Products List, the qualification requirements (paragraphs 3.1 and 4.3) of Specification MIL-G-21032 shall be waived for procurement of Series 900, 1500 and 2500, Type II Gaskets.

☆ U. S. GOVERNMENT PRINTING OFFICE 158-341-1(9/3.4269

1 of 1

QPL-21032-10
NOTICE-1
11 August 1972
supersedes
QPL-21032-9
9 April 1949

MILITARY QUALIFIED PRODUCTS LIST

OF

FSC 5330

PRODUCTS QUALIFIED UNDER MILITARY SPECIFICATION

MIL-G-21032

GASKET, METALLIC-ASBESTOS, SPIRAL WOUND
(FOR ASA COMMERCIAL FLANGED JOINTS IN PIPING SYSTEMS)

| Government Designation | Manufacturer's Designation | Test or Qualification Reference | Manufacturer's Name and Address |
|---|---|---|---|
| | | | |

Qualified Products List QPL-21032-9, dated 9 April 1949, is hereby cancelled.

Qualification requirements have been deleted from the current issue of
Military Specification MIL-G-21032.

☆U.S. GOVERNMENT PRINTING OFFICE:1973-714-412/861

QPL-21032-10
NOTICE
1 of 1

1

2

**AFFIDAVIT OF MATTHEW WROBEL IN SUPPORT OF DEFENDANT LESLIE CONTROLS, INC.'S NOTICE OF REMOVAL**

3

I, Matthew Wrobel, declare:

4

5

6

1.    I am employed by Leslie Controls, Inc. ("Leslie") as the Quality and Legal Liaison, and have been employed by Leslie in various capacities for over forty-three years, including Group Director of Quality Assurance.

7

8

2.    Leslie has been in business since around 1905 and I am personally familiar with the products that Leslie has manufactured throughout its corporate history.

9

10

11

12

3.    I am also personally familiar with the degree of supervision and control exercised by the Navy and its agencies in procurement contracts with Leslie for valves and related equipment because I was personally involved in such contracts at the various stages of development, including production, testing, and acceptance.

13

14

15

16

17

18

4.    I submit this affidavit to attest to the degree of involvement, supervision, direction and control exercised by the U.S. Navy and/or its authorized agents and officers in connection with procurement contracts with Leslie for equipment to be installed aboard U.S. Naval vessels. The following paragraphs describe the contract process from the perspective of Leslie as the vendor, as well as the levels of interaction between Leslie and the Navy agents and personnel through the various stages of a given contract.

19

20

21

5.    Leslie furnished and fabricated valves and related equipment for U.S. Navy vessels under contract between Leslie and the United States Navy Department and/or its authorized government agencies, officers and personnel.

22

23

24

6.    Leslie was obligated to comply with Military Specifications ("Mil Specs") which cover all specific components of the valves and any related equipment, including accessories, subcomponents, and other materials required to fabricate the Leslie equipment.

25

26

27

7.    Equipment sold by Leslie to the U.S. Navy for use on Navy ships always had to be provided pursuant to detailed specifications issued by the government. These specifications

28

-1-

1   also dictated the materials that Leslie was to use in component parts in the equipment. These

2   specifications were made part of the contract, and strict compliance therewith was mandatory.

3         8. The U.S. Navy and/or its authorized government agencies had a consistent and

4   thorough program of inspecting equipment sold by Leslie to ensure that such equipment

5   complied with all U.S. Navy/ government contract requirements. This program of inspection

6   included ongoing site inspections during the manufacturing process at the Leslie plants. I have,

7   for over forty-three years interfaced with many if not all of the Government / Navy Quality

8   Assurance Inspectors / Representatives assigned to Leslie. The names of some of these

9   inspectors were Mr. Frank Mishnekoff (1960's), Mr. Jules Raymond (1970's), Mr. Charles

10   Crossan (1980's), Mr. Allen Eubanks (1980's), Mr. Daniel Nusekabel (1990's) and Mr. Bruce

11   Smith (1990's). I personally interacted with these individuals in different capacities on a regular

12   basis. They all had the authority, and exercised the authority, to closely inspect our work, accept

13   or reject product and to halt production on any occasion that they felt Leslie was not in

14   compliance with U.S. Navy / government contract specifications. Government, Navy and

15   shipyard quality personnel would also inspect Leslie supplied equipment at the receipt activities.

16   Government, Navy and shipyard quality personnel would perform inspections of welds and

17   materials which sometimes included x-ray film to ensure compliance with specifications.

18         9.    Numerous tests and inspections were performed upon Leslie equipment destined

19   to the U.S. Navy and/or shipbuilding companies for installation upon U.S. Navy ships. The

20   government had detailed specifications describing the inspections and testing to be

21   accomplished. Inspection and Test Report – Certificate of Compliance were issued by Leslie

22   and accepted and signed by government inspectors upon completion of thorough testing of Leslie

23   equipment. This is an example of one of the many specification requirements that would be

24   made part of the contract between Leslie and the U.S. Navy.

25         10.    U.S. Navy inspection and testing continued at the shipyards where Leslie

26   equipment was installed on board U.S. Navy ships. Inspectors at the shipyard had the authority,

27   and exercised the authority, to inspect and accept equipment based upon its compliance with

28   Navy specifications. For over forty-three years, I personally interfaced with many Government

-2-

1 and shipyard quality personnel concerning equipment supplied and it's compliance to required

2 specifications. It was understood that should these personnel deem the equipment to not be in

3 compliance with requirements, the equipment in question would be rejected and returned for

4 modification or replacement.

5      11.     U.S. Navy inspection and testing continued in "Sea Trials" wherein the Navy

6 rigorously tested all equipment at sea under diverse conditions. Only if the equipment performed

7 to the satisfaction of the Navy would that equipment be accepted. It was understood that the U.S.

8 Navy directed and controlled these testing procedures, and that U.S. Navy directed and

9 controlled whether any equipment would be found unsatisfactory so as to require modification or

10 replacement.

11      12.     The U.S Navy also conducted further testing of exemplar equipment. For

12 example, periodically Leslie was obliged to send exemplars to facilities such as the Naval

13 Engineering Station, or the Naval Boiler and Turbine Laboratory where the exemplars were

14 subjected to extensive inspection and testing under diverse conditions. Results of such testing

15 were to be directed to the Government / Navy Quality Assurance Inspectors / Representatives

16 assigned to Leslie at their address at the Leslie production facility.  Should the Navy find any

17 deficiencies in the manufacture or function of the equipment, the Navy directed and controlled

18 Leslie in formulating a response to correct any such deficiencies.

19      13.     In addition to the above design, manufacture and testing there remained an

20 obligation by Leslie to provide technical manuals for the valves and related equipment furnished

21 pursuant to a U.S. Navy / government contract.  The U.S. Navy exercised direction and control

22 over all written documentation to be delivered with its naval valves such as engineering

23 drawings, test reports, technical manuals and other technical data that could be used as needed by

24 the shipboard engineering officer during the life of the equipment.  Leslie created the technical

25 manuals in accordance with the Mil Specs and then submitted them for revisions, modifications

26 and the ultimate approval of the U.S Navy and/or its authorized government agencies.  Navy

27 personnel participated in the preparation of this kind of information and exercised specific

28 direction and control over its contents.  These manuals included safety information related to the

-3-
DECLARATION OF MATTHEW WROBEL

1   operation of naval valves and related equipment only to the extent directed by the Navy.

2       14.     Furthermore, the U.S. Navy had precise specifications, practices and procedures

3   that governed the content of any communication affixed to machinery supplied by Leslie to the

4   Navy as shown on approved Navy drawings.  At no time did the U.S. Navy instruct Leslie

5   Controls to affix warnings or caution statements regarding asbestos hazards to a piece of

6   equipment intended for installation onto a U.S. Navy.

7       15.     In conclusion, in each and all instances wherein Leslie contracted with the U.S.

8   Navy for the provision of equipment, the U.S. Navy exercised direction and control over the

9   design, manufacture, inspection and testing of all such equipment.  Pursuant to the terms of all

10  contracts which Leslie entered with the U,S, Navy, the U.S. Navy retained such authority to

11  direct and control the performance under the terms of the contract.

12

13      Executed under penalty of perjury this _1 c_ of August 2009 at _ΤΑΜΡΑ_, Florida.

14

15                                                  Matthew Wrobel

16

17                              Charlene A. Brown, Notary

18

19                              CHARLENE A. BROWN
                                MY COMMISSION # DD 815135
20                              EXPIRES: December 15, 2012
                                Bonded Thru Notary Public Underwriters

21

22

23

24

25

26

27

28

                                    -4-